| | | |
|---|---|---|
| **RENASANT BANK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. 3:10-cv-0302** |
| **ERIC ERICSON,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | **JUDGE SHARP** |
| **AND** | ) | **MAGISTRATE JUDGE GRIFFIN** |
| | ) | |
| **ERIC ERICSON,** | ) | |
| | ) | |
| **Counter-Plaintiff,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **TRICIA ERICSON,** | ) | |
| | ) | |
| **Additional Claimant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RENASANT BANK,** | ) | |
| | ) | |
| **Counter-Defendant.** | ) | |

## MEMORANDUM

In this action, Renasant Bank ("Renasant") seeks to recover from Eric Ericson unpaid

principal and interest from a loan for the construction of a home in Florida. In the amended

answer (Docket Entry No. 42), Eric Ericson and his wife, additional claimant Tricia Ericson

(collectively, "the Ericsons"), have filed multiple counterclaims against Renasant arising out of

the loan transaction. Renasant has filed two motions for partial summary judgment. (Docket

Entry Nos. 11 and 52.)  With respect to the first motion, the Ericsons have filed an opposition (Docket Entry No. 24), Renasant has replied (Docket Entry No. 34), and, after first obtaining leave from the Court, the Ericsons have filed a surreply (Docket Entry No. 43).  With respect to the second motion, the Ericsons filed their opposition (Docket Entry No. 55), and no reply was filed.

## FACTUAL BACKGROUND

In 2005, Mr. Ericson began working full-time in real estate building and development.[1] That same year, he and his wife purchased a lot in the Watersound development near Rosemary Beach, Florida.  During the summer of 2006, the Ericsons began communicating with Mary Bennie Wilson, then-senior vice-president of Renasant, about obtaining financing to construct a home on the lot.[2]  Although the Ericsons originally sought a loan of $3.8 million, Ms. Wilson suggested they increase the loan amount to $4 million.  As a condition of lending that amount, Renasant insisted on an additional $1 million of collateral.  Mr. Ericson's mother knew Rick Hart, president of Renasant's Tennessee operations, and agreed to put up this extra collateral as a certificate of deposit.

Ms. Wilson further informed the Ericsons that Renasant wanted to add a participating bank to the loan.  Renasant decided to place the participation piece of the loan with Silverton

---

[1] Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Entry Nos. 13, 28, 54, and 57) and related declarations and exhibits.  Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

[2] At the time of the original loan negotiations, Ms. Wilson worked for Capital Bank and Trust.  Renasant acquired Capital Bank and Trust in 2007.  For the sake of consistency, the Court will refer to "Renasant" throughout this memorandum.

Bank ("Silverton"), where Mr. Hart sat on the board of directors at the time.[3]  Silverton and Renasant negotiated a Participation Agreement which stated that, in the event of default and the banks' inability to reach a mutually agreeable course of action within ten business days, the decision of the participating bank (Silverton) would control.  (Docket Entry No. 25-4, Ex. 14.) Renasant did not tell the Ericsons about this provision of the Participation Agreement.

Originally, Ms. Wilson and Mr. Ericson agreed that Mr. Ericson would manage the disbursement of funds in conjunction with Renasant.  A few days before the loan closing, however, Ms. Wilson informed Mr. Ericson that, as a condition of the loan, Broadlands Financial, LLC ("Broadlands") would have to manage the construction process.  Ms. Wilson described Broadlands as the construction manager that Silverton regularly used.  Under this arrangement, construction draws would be wired directly from the banks to the contractor when Broadlands completed a site inspection report.  Mr. Ericson was upset by this condition because it would turn him into a "spectator" in the construction process.  (Docket Entry No. 26 ¶ 5.)  He wanted to have control over the payments to contractors to ensure timely construction of the house.  Nonetheless, he  acquiesced under the time constraints.

On September 21, 2006, Mr. Ericson entered into a Construction Loan Agreement ("Agreement") with Renasant for a principal amount of four million dollars.  Mr. Ericson executed a promissory note in favor of Renasant, and the note was secured by a mortgage.  The Agreement states in bold typeface, "THIS AGREEMENT SHALL BE GOVERNED BY FLORIDA LAW."  (Docket Entry No. 14-1, at 26.)  The promissory note and mortgage contain similar provisions concerning the applicability of Florida law.

---

[3] At certain relevant times, Silverton Bank was known instead as The Banker's Bank.  For the sake of consistency, the Court will refer to "Silverton" throughout this memorandum.

The construction on the Watersound property did not go smoothly. Broadlands failed to timely provide the inspection reports necessary for funding the contractor's draw requests. Mr. Ericson communicated his displeasure about Broadlands' performance to Renasant. For example, a February 8, 2007 email from Ms. Wilson to Jim Ramage, senior vice-president of Silverton, explains that Mr. Ericson was "very concerned over the length of time this process is taking to get funds to his contractor" and "d[id] not have a comfort level with all of this." (Docket Entry No. 25-4, Ex. 17.) Shortly thereafter, Ms. Wilson and Mr. Ericson met with Mr. Ramage, who revealed that the Watersound property was the first project where Silverton had used Broadlands as construction manager.

In the summer of 2007, Jason McClimans, a senior vice-president of Renasant, took over as Renasant's primary contact for the Ericsons' loan. Mr. Ericson emailed Mr. McClimans in late September 2008 to inquire about an unpaid draw request. Explaining that the loan had matured, Mr. McClimans proposed that the parties negotiate a sixty-day extension of the loan to pay the pending draw request and then consider a one-year renewal. Mr. McClimans told Mr. Ericson to come to the bank and sign a document ("First Modification") to effectuate the 60-day extension. Mr. McClimans was not present when Mr. Ericson signed the First Modification.

Immediately above the signature line, the First Modification includes the following language:

> BORROWER WAIVES ALL KNOWN AND UNKNOWN, ABSOLUTE AND CONTINGENT, CLAIMS, DEFENSES, SETOFFS OR COUNTERCLAIMS AGAINST THE PAYMENTS OF THE NOTE AND LENDER OR ITS SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS AS OF THE DATE OF THIS AGREEMENT. BORROWER ACKNOWLEDGES RECEIPT OF AN EXACT COPY OF THIS AGREEMENT.

CAUTION: IT IS IMPORTANT THAT YOU THOROUGHLY READ THIS AGREEMENT BEFORE YOU SIGN IT.

(Docket Entry No. 14-2, Ex. B, at 3.)  Mr. McClimans, the only Renasant employee to deal with Mr. Ericson on the sixty-day extension, testified that the intent of the extension was to fund the draw but not to have Mr. Ericson release his claims.  (Docket Entry No. 25-1, at 93:21—94:8.) The Ericsons did not become aware that the First Modification contained a release provision until the present dispute between the parties arose in late 2009.

After negotiating the sixty-day extension, Renasant and the Ericsons executed a one-year renewal of the construction loan, effective November 21, 2008 ("Second Modification"). (Docket Entry No. 14-3.)  Although the First and Second Modifications do not contain their own choice-of-law provisions, they expressly incorporate the terms and conditions of the original loan documents.  In conjunction with the First and Second Modifications, Renasant and Silverton negotiated additional participation agreements containing control provisions identical to the original Participation Agreement.

In May 2009, the Office of the Comptroller of the Currency seized Silverton and named the Federal Deposit Insurance Corporation ("FDIC") as its receiver.  Mr. Hart testified that he became aware of Silverton's financial distress as early as late 2008 (Docket Entry No. 25-7, at 32:22—33:1), and, shortly after the seizure, Mr. McClimans emailed colleagues that "[i]t's no shock that [Silverton is] in the situation they're in" because of his personal experience with Silverton's failure to control its expense accounts (Docket Entry No. 25-2, Ex. 4).  Once Silverton had been closed down, Mr. Ericson learned for the first time that Silverton held the controlling interest in the loan in the event of default when Mr. McClimans "made a vague reference" to Silverton's interest in a conversation about the impact of Silverton's closure.

(Docket Entry No. 26 ¶ 15.) Although Mr. Ericson asked for more detail about Silverton's controlling interest, Mr. McClimans "refused to elaborate," and Renasant did not provide Mr. Ericson with a copy of the Participation Agreement. (*Id.* ¶¶ 15-16.) Mr. Ericson then began to put together a group to attempt to purchase Silverton's piece of the loan from the FDIC. He abandoned this plan after Renasant communicated that it had the first right to buy Silverton's piece of the loan, would exercise its best efforts to do so, and would give him full credit for any discount that it obtained. (*Id.* ¶ 17.)

After internal deliberations, Renasant submitted an $801 thousand bid for Silverton's piece of the loan. The FDIC rejected this bid and auctioned the loan on DebtX. Renasant submitted a DebtX bid for $901 thousand and lost the bidding to an out-of-state bank. When Mr. Ericson learned in November 2009 about the outcome of the bidding, he concluded that Renasant's bid was not in good faith and, along with his parents, threatened to file a lawsuit against Renasant. (Docket Entry No. 26 ¶ 21.) The following month, Renasant decided to purchase the Silverton piece of the loan from the out-of-state bank for $1.525 million.

The loan matured on November 21, 2009. The Ericsons did not repay the sums due. Renasant filed the complaint in this action on March 26, 2010 to recover the unpaid principal balance of $4 million plus accrued interest. (Docket Entry No. 1.) The Ericsons filed their answer and counterclaims on April 30, 2010. (Docket Entry No. 4.)

At the completion of document production in September 2010, the Ericsons discovered an email chain from the prior year involving a Renasant employee, his spouse, and a Florida realtor. (*See* Docket Entry No. 51-1, Ex. A.) Steve Moody, a Renasant employee, emailed his wife, a Tennessee realtor, asking her to locate a real estate agent in Florida who could obtain information on comparable home values because the bank was considering foreclosure on a

property in the Watersound development.  Ms. Moody forwarded her husband's email ("Moody email") to Keith Flippo, a realtor with The Premier Property Group in Walton County, Florida. The Moody email included Ms. Moody's own comments that Renasant had a "possible foreclosure property" in Watersound.  She further explained that Renasant was "currently trying to decide what to bid for this property, at the foreclosure auction" and needed expert advice on the property's current market value.  She provided the address of the property and identified Mr. Ericson as the owner.  Mr. Flippo emailed his reply the next day, copying Mr. Moody, stating that he would try to look at the house that day and follow up with a valuation.  Mr. Flippo did not discuss the contents of the Moody email or any aspect of the house, including the possibility of a foreclosure, with anyone other than Ms. Moody.  (Docket Entry No. 51-1 ¶¶ 4-5.)  Mr. Flippo viewed the exterior of the house but was unable to set up a meeting with the listing agent to view the interior of the house.

Mr. McClimans testified that the Ericsons were caught up on their loan payments when Mr. Flippo received the Moody email in September 2009.  (Docket Entry No. 25-1, at 131:6-9.) In January 2010, Mr. Ericson received a $2.0 million offer to purchase the Watersound home through a listing agent in Mr. Flippo's group.  (Docket Entry No. 58 ¶ 5.)  The offer was less than half of the list price and just over half of a $3.75 million offer that the same agent had communicated to the Ericsons in May 2009.  Based on the Moody email and other information learned during discovery, the Ericsons obtained leave of court and filed an amended answer with additional counterclaims on December 7, 2010.  (Docket Entry No. 42.)

## STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter

of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the Court that the standards of Rule 56 have been met. *See University of Pittsburgh v. Townsend*, 542 F.3d 513, 522 (6th Cir. 2008); *Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the Court "is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

<u>**ANALYSIS**</u>

Renasant's first motion argues that summary judgment is appropriate because the Ericsons waived every counterclaim and defense to payment by executing the First Modification

with its release provision and by failing to repudiate the loan documents promptly upon discovering their claims. Renasant's second motion specifically seeks summary judgment on the Ericsons' counterclaims for breach of fiduciary duty, violation of the Tennessee Financial Records Privacy Act, and intentional interference with business relationships.

## A.    First Motion

### 1.    Execution of First Modification

When Mr. Ericson executed the First Modification on September 21, 2008, it included a waiver of "all claims, defenses, setoffs, or counterclaims against the payment of the note and lender . . . as of the date of this agreement" (emphasis omitted). Renasant asks the Court to enforce this waiver provision to negate all of the Ericsons' affirmative defenses against payment of the note and counterclaims against Renasant, the lender.

As an introductory matter, the Court must determine what law governs the interpretation of the loan documents. The original Agreement, note, and mortgage each contain a choice-of-law clause applying Florida law. Although the First Modification and Second Modification do not contain any choice-of-law provision, both incorporate by reference the unmodified terms of the original loan documents. Accordingly, the Court finds that Florida law governs the interpretation of the loan documents, including the First Modification.

Under Florida law, "[a] party is bound by, and a court is powerless to rewrite, the clear and unambiguous terms of a voluntary contract. It is not the role of the courts to make an otherwise valid contract more reasonable from the standpoint of one contracting party." *Med. Ctr. Health Plan v. Brick*, 572 So. 2d 548, 551 (Fla. Dist. Ct. App. 1990) (citations omitted). This rule applies to the construction of waiver and release provisions. *E.g.*, *Churchville v. GACS Inc.*, 973 So. 2d 1212, 1216 (Fla. Dist. Ct. App. 2008). Nonetheless, in this case, the Ericsons

argue that a mutual mistake resulted in the inclusion of the waiver provision in the First Modification. Florida law defines "mutual mistake" as the parties "'agree[ing] to one thing and then, due to either a scrivener's error or inadvertence, express[ing] something different in the written instrument.'" *L & H Constr. Co. v. Circle Redmont, Inc.*, 55 So. 3d 630, 634 (Fla. Dist. Ct. App. 2011) (quoting *Providence Square Ass'n v. Biancardi*, 507 So. 2d 1366, 1372 (Fla. 1987)). Mutual mistake is a valid defense to the enforcement of a release. *See CJM Fin., Inc. v. Castillo Grand, LLC*, 50 So. 3d 863, 864 (Fla. Dist. Ct. App. 2010). "If it is alleged that the language did not reflect the actual intent of the parties [or] that a party executed the document by mistake, . . . then the trial court may consider other facts related to the execution of the document in determining its scope and meaning." *McKeever v. Rushing*, 41 So. 3d 920, 923 (Fla. Dist. Ct. App. 2010). Specifically, where one party to the agreement seeks reformation of the waiver provision (as the Ericsons seek in this case), "parole evidence is admissible under those circumstances to determine the true intent of the parties." *Abernethy v. Nat'l Union Fire Ins. Co.*, 717 So. 2d 196, 198 (Fla. Dist. Ct. App. 1998).

Here, the Ericsons submit sufficient parole evidence to create a triable question of fact as to whether the waiver provision in the First Modification was included by a mutual mistake. Mr. Ericson's affidavit states that the parties did not intend to include a release in the First Modification. The deposition of Mr. McClimans, Renasant's senior vice-president and Mr. Ericson's primary contact at Renasant when the First Modification was executed, confirms Mr. Ericson's understanding. Mr McClimans testified that he did not tell Mr. Ericson about the waiver provision in the First Modification. When asked if the parties intended for Mr. Ericson to

release his claims as part of the sixty-day extension, he testified, "on my part, absolutely not."[4]

Before the Court can enforce the waiver in the First Modification, the Court must adjudicate the Ericsons' counterclaim for reformation of the First Modification, which calls for the removal of the waiver provision from the agreement. Factual disputes surrounding the reformation claim preclude a grant of summary judgment based on the waiver language in the First Modification.[5]

### 2. Ratification of Loan Documents

If the Ericsons did not waive their affirmative defenses and counterclaims by virtue of the waiver language in the First Modification, Renasant argues that the Ericsons waived those defenses and counterclaims by their conduct in ratifying the loan documents, entering agreements to modify the loan, and accepting loan advances, rather than promptly repudiating the loan documents after learning of their claims. Again applying Florida law, "'[t]he elements of waiver are: (1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge of the right; and (3) the

---

[4] Along with its reply brief, Renasant includes the affidavit of Mitch Waycaster, a senior vice-president who testifies concerning the custom forms that Renasant uses for loan renewals, extensions, and modifications. (*See* Docket Entry No. 36-1.) The Ericsons point out that Renasant did not identify Mr. Waycaster as a person with knowledge of discoverable facts, either in its Rule 26(a)(1) disclosures or in its responses to the Ericsons' written discovery requests. Mr. Waycaster's testimony essentially confirms the factual dispute whether the release was included in the First Modification by mutual mistake. Although the Court has some concern about the admissibility of Waycaster's testimony for failure to disclose the witness, the Court need not resolve that issue here.

[5] Even if the Court were ultimately to find that the waiver is enforceable, it does not necessarily bar all of the Ericsons' counterclaims. As set forth in *Scarborough Associates v. Financial Federal Savings & Loan Association of Dade County* (a case cited by Renasant), language waiving counterclaims as of the date of an agreement "does not discuss any claims which might arise on the basis of events occurring after" the stated date, "nor does the clause contain a promise not to raise defenses based on events which might occur" after the stated date. 647 So. 2d 1001, 1003 (Fla. Dist. Ct. App. 1994).

intention to relinquish the right.'" *Zurstrassen v. Stonier*, 786 So. 2d 65, 70 (Fla. Dist. Ct. App. 2001) (quoting *Leonardo v. State Farm Fire & Cas. Co.*, 675 So. 2d 176, 178 (Fla. Dist. Ct. App. 1996)).  The party waiving its claim "must possess all of the material facts in order to constitute waiver," although the waiver of a fraud claim "can occur where a party should have discovered the fraud through ordinary diligence."  *Id.*  "Waiver does not arise from forbearance for a reasonable time, but may be inferred from conduct or acts 'putting one off his guard and leading him to believe that a right has been waived.'"  *County of Brevard v. Miorelli Eng'g, Inc.*, 703 So. 2d 1049, 1052 n.4 (Fla. 1997) (Anstead, J., concurring and dissenting) (quoting *Gilman v. Butzloff*, 22 So. 2d 263, 265 (Fla. 1945)); *accord Costello v. The Curtis Bldg. P'ship*, 864 So. 2d 1241, 1244 (Fla. Dist. Ct. App. 2004) (explaining that "the party's conduct must establish clear relinquishment").  In the context of negotiable instruments, one who renews a note "with knowledge at the time of a partial failure of the consideration for the original note, or false representations by the payee, etc., waives such defense, and cannot set it up to defeat a recovery on the renewal note[.]"  *Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 522 (Fla. Dist. Ct. App. 1994).  A party renewing the note is also bound if the knowledge of the available defenses could have been discovered through the exercise of ordinary diligence.  *Id.*

Waiver based on ratification of the loan documents is an inappropriate basis for summary judgment in this case because there are triable questions of fact concerning the timing of the Ericsons' actual and constructive knowledge of their rights.  For example, the Office of the Comptroller of the Currency did not close Silverton until May 2009, well after the execution of the loan modifications.  After the closure, Mr. Ericson then learned from Mr. McClimans about Silverton's controlling interest in the loan in the event of default.  Ericson also did not know about Renasant's initial failure to purchase Silverton's piece of the loan from the FDIC until

November 2009, the same month in which the loan matured.  Furthermore, when Ericson learned the details of Renasant's attempts to purchase Silverton's piece of the loan, he and his parents threatened to file a lawsuit against Renasant.  The Ericsons' knowledge of the claims based on these facts all followed after the execution of the loan modifications, with some even coming after the loan itself had matured.  Other claims, such as the alleged violation of the Tennessee Financial Records Privacy Act and intentional interference with business relationships, arise from an email that the Ericsons discovered at the end of document production in 2010.  Because "[t]he issue of due diligence is one of fact," *Capital Bank*, 644 So. 2d at 522, a determination as to what the Ericsons could have learned through ordinary diligence is properly reserved for trial. Therefore, the Court is unable to say, as a matter of law, that the Ericsons' failure to assert their claims prior to Renasant's filing of this civil action amounts to a "clear relinquishment" of those claims.  *See Costello*, 864 F.2d at 1244.  At the summary judgment stage, the Court is unable to conclude that the Ericsons waived their counterclaims and defenses to payment by executing the loan modifications and continuing to accept draws pursuant to the loan documents.[6]

**B.     Second Motion**

Renasant's second motion seeks summary judgment on the Ericsons' claims for breach of fiduciary duty, violation of the Tennessee Financial Records Privacy Act, and intentional interference with business relationships.  The second motion recognizes that these three claims

---

[6] The Court recognizes that, with respect to certain facts, Renasant may be able to establish the Ericsons' actual or constructive knowledge prior to executing the loan modifications and while accepting loan draws.  For example, by his own admission, Mr. Ericson learned in 2007 that Silverton had never previously engaged Broadlands to administer a construction loan project. While Renasant may be able to preclude the Ericsons from introducing certain evidence on the grounds of waiver by conduct, this does not entitle Renasant to summary judgment on the entire claim.

arise, at least in part,[7] out of the Moody email. In addition to making arguments specific to each claim, Renasant argues that it is entitled to summary judgment on all three claims because the Moody email did not proximately cause any of the Ericsons' alleged damages.  Renasant cites Mr. Flippo's testimony that he did not discuss the Moody email, the Ericsons' home, or the possibility of its foreclosure with anyone other than Ms. Moody.  Accordingly, Renasant argues that the Moody email could not have caused the Ericsons' damages because the substance of the Moody email never went beyond Mr. Flippo.  In response, the Ericsons point to an offer received four months after the Moody email through an agent in Mr. Flippo's office seeking to purchase the Watersound house for about half of the asking price.

Despite Renasant's proof that Mr. Flippo did not communicate the contents of the Moody email, the Court concludes that the Ericsons have created a genuine dispute of material fact on this issue by pointing to the offer conveyed through another agent in Mr. Flippo's office.  This offer provides circumstantial evidence that the Moody email proximately caused damage to the Ericsons because, notwithstanding his testimony to the contrary, Mr. Flippo conveyed to third parties in his office that the Watersound property might be subject to foreclosure in the future. The trier of fact must determine the credibility of Mr. Flippo's testimony and the plausibility of other reasons why a prospective buyer would have made such a low offer on the Watersound property at that time.  Because summary judgment is inappropriate on the issue of proximate causation and damages, the Court continues on to consider Renasant's other arguments for summary judgment on the Ericsons' claims for breach of fiduciary duty, violation of the

---

[7]  In opposing summary judgment, the Ericsons agree that their claims for violation of the Financial Records Privacy Act and intentional interference with business relationships are based on Renasant's sending the Moody email.  Their claim for breach of fiduciary duty, however, is based on all of Renasant's actions, including but not limited to the Moody email.

Tennessee Financial Records Privacy Act, and intentional interference with business relationships.

### 1.      Breach of Fiduciary Duty

Renasant argues that it is entitled to summary judgment on the Ericsons' claim for breach of fiduciary duty because Renasant owed no such duty to the Ericsons, as a matter of law. Like the issues presented in the first motion, the analysis of the Ericsons' claim for breach of fiduciary duty is complicated by the parties' disagreement concerning which state's law applies. Renasant assumes that Tennessee law applies but does not explain why. The Ericsons argue that Florida law applies because the relationship between Renasant and the Ericsons arises out of the loan documents containing Florida choice-of-law provisions. It appears to the Court that Florida law governs this claim.

Applying Florida law, summary judgment is inappropriate on the Ericsons' claim for breach of fiduciary duty. Generally, debtor-creditor relationships involving arms-length transactions do not give rise to fiduciary duties. *Lanz v. Resolution Trust Corp.*, 764 F. Supp. 176, 179 (S.D. Fla. 1991); *Capital Bank*, 644 So. 2d at 518. Based upon the specific facts surrounding the transaction and the parties' relationship, however, "a fiduciary relationship arises where 'the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying on the bank so to counsel and inform him.'" *Capital Bank*, 644 So. 2d at 519 (quoting *Klein v. First Edina Nat'l Bank*, 196 N.W.2d 619, 623 (Minn. 1972)). Furthermore, "'special circumstances' may impose a fiduciary duty on a bank, including where the lender 1) takes on extra services for a customer, 2) receives any greater economic benefit than from a typical transaction, or 3) exercises extensive control." *Id.* (citing *Tokarz v. Frontier Fed. Sav. & Loan Ass'n*, 656 P.2d 1089, 1094 (Wash. Ct. App. 1982)).

The Florida District Court of Appeal's decision in *First National Bank & Trust Co. of Treasurer Coast v. Pack* applies these fiduciary principles in the context of a construction loan. 789 So. 2d 411 (Fla. Dist. Ct. App. 2001). In *Pack*, the plaintiffs were prospective buyers who met with the bank's representative inside a model home constructed by the developer. *Id.* at 413. The bank's representative indicated that many construction loan borrowers had used the developer and described the developer as "a quality company." *Id.* After the plaintiffs entered into a construction loan agreement with the bank, the developer engaged in a persistent pattern of delayed, shoddy construction. *Id.* The plaintiffs periodically contacted the bank to intervene in resolving the problems with the construction. *Id.* Right before the closing, the plaintiffs unsuccessfully tried to persuade the bank to freeze the final draw to make sure that the developer would fix the construction defects. *Id.* at 414. The bank refused, telling the plaintiffs that the developer's owner was a trustworthy person and would provide an affidavit assuring the developer's repair of the defects. *Id.* The bank never provided that affidavit and subsequently informed the plaintiffs that the developer was having financial problems. *Id.*

A jury returned a verdict for the plaintiffs on their claim for breach of fiduciary duty, finding that the bank owed such a duty because it had taken on extra services for the plaintiffs and knew (or should have known) that they were placing trust and confidence in the bank and relying on it to counsel and inform them. *Id.* The appellate court held there was sufficient evidence to uphold that verdict. *Id.* at 415. The court pointed to the plaintiffs' request that the bank help them obtain a builder and reliance on the bank's assistance to keep the project moving along and to explain their options at the time of the closing. *Id.* at 415-16.

The facts of *Pack* are sufficiently similar to the case at bar for the Ericsons' claim to survive summary judgment. At Ms. Wilson's suggestion, Mr. Ericson agreed to increase the

amount of the loan to $4 million. To make the loan in that amount, Renasant required an additional $1 million of collateral, which came from Mr. Ericson's mother. Ms. Wilson also informed Mr. Ericson that Renasant wanted to add a participating bank to the loan and intended to choose Silverton. Mr. Ericson agreed to Silverton's participation without knowing that Silverton would have the controlling interest in the loan in the event of default and was never apprised about Silverton's subsequent vulnerability to financial difficulties. Finally, a few days before the loan closing, Ms. Wilson informed Mr. Ericson that Broadlands would have to administer the entire construction process, including the disbursement of funds, as a condition of the loan. Based on the time pressure and the representation that Broadlands was Silverton's construction manager of choice, Mr. Ericson accepted the condition. He felt, however, that the condition effectively gave Broadlands financial control over the project and reduced him to a "spectator."

Based on these facts, the Court is unable to conclude, as a matter of law, that Renasant did not owe a fiduciary duty to the Ericsons. Admittedly, Mr. Ericson's experience in real estate development makes him a more sophisticated borrower than the plaintiffs in *Pack*. Nonetheless, certain facts indicate that Renasant had reason to know that Mr. Ericson was placing his trust and confidence in it and was relying on it for counsel and information. These facts also indicate that Renasant may have taken on extra services and, through its business partners, exercised extensive control over the project. The Ericsons also maintain that Renasant received extra economic benefit from the transaction because it ultimately purchased Silverton's piece of the loan at a discount. Summary judgment is inappropriate on the Ericsons' claim for breach of fiduciary duty.

   **2.**   **Tennessee Financial Records Privacy Act**

Pursuant to the Financial Records Privacy Act, unless expressly permitted by the statute, "a financial institution may not disclose to any person, except to the customer or the customer's agent, any financial records relating to that customer."  Tenn. Code Ann. § 45-10-104(a) (2007). The statute defines "financial records" as

> any original document, any copy of an original document, or any information contained in the document, other than a customer's name, address, and account number, held by or in the custody of a financial institution, where the document, copy or information is identifiable as pertaining to one (1) or more customers of the institution.

Id. § 45-10-102(4) (2007).

The Ericsons maintain that, while the statute permitted the Moody email's disclosure of Mr. Ericson's name and the address of the property, it did not permit the remainder of the email's contents.  The only other detail pertinent to the Ericsons is the email's description of the Watersound property as a "possible foreclosure property."  The rest of the email pertains to the bank's strategy if a foreclosure actually took place.  At the time of the Moody email, however, the Ericsons were not in default on the loan.  Therefore, the bank's anticipation of the possibility of future foreclosure does not reflect the kind of "information" about the status of the loan that would be contained in some document within the bank's custody.

In *Fifth Third Bank v. Steve Hulen Construction, LLC*, the counter-plaintiffs, two individuals and their construction company, received loans to finance home construction from the counter-defendant bank.  No. 3:11-0035, 2011 WL 2433711, at *1 (M.D. Tenn. June 14, 2011).  Following the financial crisis of late 2008, the bank insisted on loan modifications that made it difficult for the counter-plaintiffs to meet their obligations.  *Id.* at *2.  Although the counter-plaintiffs negotiated a forbearance agreement in January 2010, they could not sell the subject properties in time, and the bank foreclosed later that year.  *Id.* at *3.  In early 2011, one

of the individual counter-plaintiffs encountered a loan officer who had left the bank in 2008 but stayed in touch with the bank employees who negotiated the counter-plaintiffs' loan modifications and forbearance agreement. *Id.* According to the allegations of the complaint, the former loan officer knew "a striking amount of detail" about the substance of the counter-plaintiffs' dealings with the bank since the loan officer's departure. *Id.* The court denied the motion to dismiss the counter-plaintiffs' claim for violation of the Financial Records Privacy Act, noting that the most favorable reading of the allegations indicated the bank's disclosure of the forbearance agreement, the foreclosure, and "other assorted difficulties." *Id.* at *6.

Although the *Fifth Third Bank* decision arose from a different procedural posture, its analysis is instructive because it points out meaningful distinctions in the factual record of this case. The Moody email did not provide "a striking amount of detail" about agreements and transactions that had actually taken place between Renasant and the Ericsons. Furthermore, the Moody email, which was sent at a time when the Ericsons were current on their loan obligations, preceded any actual proceedings to recover unpaid sums.

Instead, the Moody email merely references, without further elaboration, a "possible foreclosure property" forthcoming in the Watersound development. The plain language of the Financial Records Privacy Act makes this distinction meaningful. The statute prohibits the disclosure of "financial records," a term defined as "any original document, any copy of an original document, or any information contained in the document." Tenn. Code Ann. § 45-10-102(4). In other words, the statute's prohibition is closely tethered to the contents of actual "records" or documents, rather than all financial information involving a customer. *Compare, e.g.*, Cal. Fin. Code §§ 4052-4052.5 (West, Westlaw through ch. 28 of 2011 Reg. Sess.) (prohibiting disclosure to third parties of "nonpublic personal information," which includes

19

"personally identifiable financial information (1) provided by a consumer to a financial institution, (2) resulting from any transaction with the consumer or any service performed for the consumer, or (3) otherwise obtained by the financial institution"); Vt. Stat. Ann. tit. 8, § 10202(4)(E) (West, Westlaw through No. 13 of 2011-12 Sess.) (defining "[f]inancial information" to include "any information that relates to a loan account or an application for a loan"). Here, the Moody email references a "possible foreclosure property" where the bank had not yet initiated foreclosure proceedings and thus would not have documentation of an actual foreclosure. The Ericsons have failed to create a triable question of fact that the Moody email contained information from bank documents pertaining to foreclosure on the Watersound property.

Because the material facts are undisputed and the reference to a possible future foreclosure is insufficient to meet the statute's definition of "financial records," the Court concludes that Renasant is entitled to judgment as a matter of law on the Ericsons' claim for violation of the Financial Records Privacy Act.[8]

### 3.    Intentional Interference with Business Relationships

The Tennessee Supreme Court has set forth the following five elements of the tort of intentional interference with business relationships:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

---

[8] This Court's analysis assumes without deciding that a private right of action exists pursuant to the Financial Records Privacy Act. *See Fifth Third Bank*, 2011 WL 2433711, at *6 n.7.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (emphasis, footnotes, and citation omitted).[9]  In recognizing this tort, the court focused on "add[ing] the requirement of proof of *improper* conduct extending beyond the bounds of doing business in a freely competitive economy." *Id.* at 700.  While acknowledging that the meaning of "improper" conduct depends on the particular case, the court indicated that "improper motive" required a showing "that the defendant's predominant purpose was to injure the plaintiff." *Id.* at 701 n.5 (citing *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 307-08 (Utah 1982)).  "Improper means" would include "those means that are illegal or independently tortious" and "those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct." *Id.*  In the context of a specific case, "improper means" included defamatory statements concerning a company president's involvement in the use and sale of illegal drugs, membership in the mob, cheating of customers, sexual relations with employees, and problems with the IRS. *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 184 (Tenn. Ct. App. 2007).

In this case, the Ericsons argue that Renasant intentionally interfered with their prospective business relationship with realtors and potential buyers in the Watersound market and accomplished this interference through the allegedly "improper means" of the Moody email. The Court agrees with Renasant that summary judgment is appropriate on this claim.  Renasant has carried its burden by pointing to a lack of evidence to establish its intent to cause the breach or termination of the Ericsons' prospective relationships.  The Ericsons, vaguely referencing a "myriad of conflicting evidence," have failed to point to specific facts in the record that would

---

[9] The Court reviews the claim for intentional interference with business relationships pursuant to Tennessee law, as neither party contends that Florida law applies to this tort-based claim.

create a genuine issue for trial. The substance of the Moody email's inquiry about the value of comparable properties does not manifest the requisite intent. Renasant's isolated request for an estimate of a property's market value simply does not create a triable question as to its intent to interfere with the Ericsons' prospective relationships with realtors and potential buyers. Therefore, Renasant prevails on this claim, as a matter of law.

## CONCLUSION

For the reasons discussed herein, the counter-defendant's first motion for partial summary judgment is denied. The counter-defendant's second motion for summary judgment is denied as to the counterclaim for breach of fiduciary duty and granted as to the counterclaims for violation of the Tennessee Financial Records Privacy Act and intentional interference with business relations.

An appropriate order will enter.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE