| | | |
|---|---|---|
| RENASANT BANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 3:10-cv-0302 |
| ERIC ERICSON, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | JUDGE SHARP |
| AND | ) | MAGISTRATE JUDGE GRIFFIN |
| | ) | |
| ERIC ERICSON, | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TRICIA ERICSON, | ) | |
| | ) | |
| Additional Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RENASANT BANK, | ) | |
| | ) | |
| Counter-Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Renasant Bank ("Renasant" or "Plaintiff") seeks a judgment against Defendant

Eric Ericson ("Ericson or "Defendant") for the unpaid principal balance of a note for a

construction loan, plus accrued interest and the costs of collection. Ericson denied liability in the

amount of $4 million on the note and asserted counterclaims for breach of contract; fraud,

negligent misrepresentation, and promissory estoppel; breach of fiduciary duty; negligence; and

violation of the Tennessee Consumer Protection Act.[1] Ericson's wife, Tricia Ericson ("Mrs. Ericson"), joined in the assertion of counterclaims. The Court has diversity jurisdiction. 28 U.S.C.A. § 1332(a)(1) (2006).

The Court held a bench trial in this action from August 9-12, 2011, after which the parties were instructed to file proposed findings of fact and conclusions of law. These proposed findings and conclusions were filed on October 3, 2011. With leave of court, the parties filed their reply briefs on October 11, 2011.

Having reviewed the parties' proposed findings and conclusions, the record, the exhibits received in evidence, and the testimony of the witnesses, after considering their interests and demeanor, the Court enters the following Findings of Fact and Conclusions of Law. Except where the Court discusses different testimony on a specific issue, any contrary testimony on a specific matter has been rejected in favor of the specific fact found. Further, the Court omits from its recitation facts which it deems to be immaterial to the issues presented.

## I. FINDINGS OF FACT

### A.    Construction Loan

1.      In July 2005, Eric and Tricia Ericson purchased a lot in the Watersound development near Rosemary Beach, Florida. The lot was titled in Mrs. Ericson's name for estate planning purposes.

2.      With a loan on the property from Wachovia Bank set to expire in September 2006, the Ericsons sought a construction loan to build a high-quality house on the property for

---

[1] Prior to trial, the Court granted summary judgment to Renasant on Ericson's counterclaims for violation of the Tennessee Financial Records Privacy Act and intentional interference with business relations.

resale. Ericson sought a loan totaling approximately $3,750,000 in order to pay off the existing mortgage on the property and finance the construction.

3.      The loan was originally made by Capital Bank & Trust Company ("Capital"). Capital was acquired by Renasant on July 1, 2007. References to Renasant for periods prior to July 1, 2007, will mean Capital Bank & Trust Company.

4.      At the encouragement of colleagues and acquaintances, Ericson sought the construction loan from Mary Bennie Wilson, a senior vice-president of Renasant who specialized in construction lending. Additionally, Ericson's mother, Janice Wendell, had a preexisting relationship with Rick Hart, who was the President of Renasant at the time. Ericson began discussing the construction financing with Wilson in July 2006.

5.      Wilson advised Ericson that the loan amount should be increased to $4,000,000 based on the appraised value of the property. Ericson agreed to Wilson's recommendation.

6.      The construction loan request was considered by Renasant's loan committee at least twice. The loan committee put two conditions on the loan. First, a participating bank would take $2,000,000 of the $4,000,000 risk. Second, $1,000,000 of additional collateral would be provided. On September 5, 2006, Mr. Ericson signed the commitment letter accepting these conditions.

7.      Renasant placed the participation piece of the loan with The Bankers Bank, a correspondent bank based in Atlanta where Hart sat on the board of directors. Subsequently, The Banker's Bank changed its name to Silverton Bank ("Silverton"). All references herein will be made to Silverton.

8.      Ericson obtained the additional $1,000,000 of collateral by getting his mother and step-father, Mr. and Mrs. Wendell (collectively, "Wendells") to purchase a $1,000,000 certificate of deposit at Renasant that was pledged to secure the construction loan.

9.      Silverton conditioned its purchase of the participation interest on the use of Broadlands Financial, LLC ("Broadlands") for construction management and inspection services on the project.  All construction draws would be subject to Broadlands's approval and completion of its inspections.

10.     The parties closed the loan on September 21, 2006.  The relevant documents included the Construction Loan Agreement, Promissory Note, and Line of Credit, executed by Ericson and Renasant; the Mortgage, executed by Mrs. Ericson and Renasant; and the Certificate of Deposit and Pledge Agreement, executed by the Wendells.

11.     That same day, Renasant executed a Participation Agreement with Silverton concerning Ericson's loan.

12.     Paragraph 16(e) of the Participation Agreement contains the following provision:

> Upon becoming actually aware of a default by Borrower(s) . . . , Originating Bank [Renasant] immediately shall notify Participating Bank [Silverton] of such default or event, and Originating Bank and Participating Bank shall mutually agree upon a course of action within ten (10) business days.  If, within ten (10) business days a mutually agreeable course of action can not be decided, then, so long as either (i) the Participation Interest . . . equals or exceeds a majority of the then outstanding principal balance of the Loan, or (ii) the Participating Bank holds any Participation Interest as a result of the Originating Bank's inability to purchase that retained portion of the Participation Interest due to regulatory lending limits considerations . . . , the decision of the Participating Bank shall control.

The uncontradicted testimony is that the provision giving control to Silverton (the participating bank) in the event of default was very unusual in the banking industry.  No Renasant employee

4

testifying (whether live or by deposition) claimed knowledge of how this provision ended up in the Participation Agreement.

13.     No one at Renasant informed the Ericsons or the Wendells of this language in the Participation Agreement.  Ericson requested a copy of the Participation Agreement at or before the closing of the construction loan, but Renasant did not provide a copy.

**B.     Construction and Loan Renewal**

14.     On August 10, 2006, Ericson had entered a contract with Ray Jackson Construction, LLC ("RJC") to build the house.  Construction actually began in November 2006. The contract estimated the house would be complete within fourteen months of the start date and held RJC responsible for costs associated with delay beyond sixteen months.

15.     There was a great deal of testimony about the role played by Broadlands in delaying the progress of the construction from the loan closing through March 2007.  Ericson met with Hart in March 2007 to discuss Broadlands.  After that meeting, Broadlands no longer approved the project funding, and its performance of inspections was no longer a precondition to funding.

16.     Ericson visited the house in August 2007 and discovered construction defects. Ericson terminated the contract with RJC and immediately hired Consolidated Builders ("Consolidated") to resume construction.  Correspondence from Ericson's counsel to RJC held RJC's "obvious failure to supervise and manage this project and the resulting construction defects" responsible for "caus[ing] the entire construction to fall substantially behind schedule."

17.     Consolidated did not finish the house within the originally contemplated sixteenth-month timeline.  Construction on the house continued throughout 2008.

18.     The loan matured on September 21, 2008.  More than 90% of the loan had been funded by that time.

19.     After Wilson left her employment at Renasant in July 2007, Jason McClimans took over as the Renasant loan officer in charge of Ericson's construction loan.

20.     Consolidated submitted a draw request for approximately $33,000 after the loan had matured.  On September 29, 2008, Ericson emailed Renasant to inquire about the status of the draw.  McClimans responded that Renasant could not fund the draw because the construction loan had matured.

21.     During a subsequent telephone call, McClimans and Ericson agreed to do an administrative renewal of the loan, *i.e.*, to execute a sixty-day extension so the draw could be funded while Renasant and Ericson worked out a longer-term extension.

22.     McClimans testified that the purpose of the administrative renewal was to get the loan renewed so the pending draw request could be funded, and that it was not his personal intent for the renewal agreement to waive any claims Ericson had.

23.     To accomplish the administrative renewal, McClimans's assistant submitted paperwork to Renasant's central processing area in Tupelo, Mississippi.  The central processing area prepared a renewal agreement and sent it to Nashville.

24.     At McClimans's invitation, Ericson went to the bank to sign the renewal agreement.  McClimans was not present when Ericson signed the renewal agreement.

25.     The renewal agreement is a two-page document that includes a written waiver of claims.  On the second page of the renewal agreement, just above Ericson's signature, is the following language in all capital letters:

> BORROWER WAIVES ALL KNOWN AND UNKNOWN, ABSOLUTE AND
> CONTINGENT, CLAIMS, DEFENSES, SETOFFS OR COUNTERCLAIMS
> AGAINST THE PAYMENTS OF THE NOTE AND LENDER OR ITS
> SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS
> AS OF THE DATE OF THIS AGREEMENT. BORROWER
> ACKNOWLEDGES RECEIPT OF AN EXACT COPY OF THIS
> AGREEMENT.
>
> CAUTION: IT IS IMPORTANT THAT YOU THOROUGHLY READ THIS
> AGREEMENT BEFORE YOU SIGN IT.

26.     Ericson testified that he read the self-described "business points" of the renewal agreement but did not acknowledge reading the written waiver or the notice that he should read the entire agreement.

27.     Mitch Waycaster, a Renasant senior executive vice-president and chief administrative officer, testified about Renasant's loan renewal process. In 2006, Waycaster participated in the development of the custom form renewal agreement that Ericson signed.

28.     Waycaster testified that Renasant intended to include the waiver language in the renewal form and that the waiver appears in every modification processed by Renasant. This renewal form is always used to process a sixty-day administrative renewal. To Waycaster's knowledge, Renasant has never deleted the waiver language from an administrative renewal agreement. McClimans did not have authority to remove the waiver language.

29.     Ericson is a college graduate, previously worked for two brokerage houses, and has been a real estate developer for some time.

30.     Following the administrative renewal, Renasant and Ericson entered negotiations for a renewal to extend the maturity date to November 21, 2009. The loan documents were signed on December 30, 2008, but the effective date of the loan renewal was November 21, 2008.

31.     The interest carry on the construction loan was depleted.  Therefore, Renasant made a second loan to Ericson and Mrs. Wendell in the amount of $250,000 to pay the interest on the construction loan.  This loan was ultimately paid off.

32.     In connection with each loan extension, Renasant signed another participation agreement with Silverton, again giving Silverton control of the loan under the limited circumstances set forth in the original Participation Agreement.

33.     The final draw on the construction loan took place on March 30, 2009.  This amount increased the loan balance to $4 million.  As of the final draw, the house was approximately 95% complete and on the market for sale.

**C.     Repurchase of Silverton Interest**

34.     On May 1, 2009, the Federal Deposit Insurance Corporation ("FDIC") seized Silverton because it was a failed bank.  At the same time, the FDIC notified Renasant of Silverton's seizure.

35.     Renasant officials met shortly thereafter to discuss the implication of Silverton's failure on Ericson's loan.  Based on the unanimous testimony of McClimans, Wilson, Wyatt, and Hart, the Court finds that Renasant first became aware of the existence of the Participation Agreement provision giving control to Silverton in the event of default after Silverton had failed. Nor, therefore, had the Ericsons or Wendells previously been informed of this provision.

36.     McClimans called Ericson to inform him that the FDIC had seized Silverton, which held the control piece of the loan.  When Ericson asked McClimans what he meant by the "control" piece of the loan, McClimans informed Ericson that he would have to get back to him.

37.     After seizing Silverton, the FDIC began the process of attempting to sell off the loans held by Silverton.  Pursuant to the FDIC process, as a co-participant on Ericson's loan,

Renasant would have the first opportunity to purchase Silverton's piece of Ericson's loan. If Renasant failed to offer a sufficient price for the loan, however, the FDIC would put the loan up for public auction, where any qualified entity could purchase the loan and the associated control rights.

38.     Once he learned of the FDIC's seizure of Silverton, Ericson ceased construction on the house due to the uncertain status of the Silverton piece of the loan. Ericson subsequently informed Renasant that he was exploring purchasing the Silverton piece of the loan from the FDIC, either in an individual capacity or in collaboration with a qualified financial group.

39.     Ericson, through counsel, requested that Renasant provide him with Renasant's Participation Agreement with Silverton on his construction loan, so that he could understand the implications of Mr. McClimans's comments regarding Silverton's "control." Renasant, however, refused all of Ericson's requests in this regard throughout 2009 and did not provide a copy of the Participation Agreement until after it had repurchased the participation interest from another bank in 2010.

40.     Renasant executives met with Ericson's counsel regarding the FDIC's sale of Silverton's participation piece of the loan. In that meeting, Hart promised that Renasant would handle the repurchase. Once Renasant repurchased Silverton's piece of the loan, Renasant would apply any discount obtained through that process to reduce Ericson's principal balance on the construction loan. Therefore, Ericson did not need to attempt to repurchase the loan directly. To the extent Hart testified that he conditioned the discount on Ericson first repaying the principal balance of the loan, the Court finds that Hart was not a credible witness and assigns no weight to this testimony.

41. After receiving Hart's promise, Ericson immediately ceased his efforts to purchase the Silverton piece of the loan from the FDIC. Ericson concluded that it did not make financial sense to bid against Renasant for the Silverton participation piece of his loan, because that would only lessen the discount he would ultimately receive.

42. The FDIC allowed Renasant to make a bid to repurchase the participation interest from the FDIC. There was robust internal discussion at Renasant about the amount of the bid to the FDIC. Renasant's Regional Loan Committee ultimately approved a bid of $801,000. The FDIC rejected this offer.

43. The FDIC then conducted an auction through DebtX for the participation interest. Only FDIC-insured institutions could participate in the DebtX auction.

44. Renasant made a bid at the DebtX auction of $901,000. Gulf Coast Bank and Trust Company ("Gulf Coast"), a Louisiana-based financial institution, purchased the participation interest for $1,020,000. Gulf Coast Bank acquired the interest on or about November 30, 2009.

45. In December 2009, Renasant negotiated with Gulf Coast to acquire the participation interest. Renasant ultimately paid $1,525,000. The transaction closed on January 4, 2010. The $475,000 difference between the purchase price and the face value of the participation interest is the amount of the discount at issue in this case.

46. After Gulf Coast acquired the loan, its representative emailed Fred Wyatt, a senior credit officer for Renasant in Nashville, stating that "[i]n order to protect [Gulf Coast's] collateral, the demand, foreclosure and other legal action should be pushed along as rapidly as possible." However, no evidence was presented that there was ever a disagreement between Renasant and Gulf Coast between the date Gulf Coast acquired the participation interest of the

loan and the date Renasant acquired the participation interest from Gulf Coast. The Court finds that the presence of Paragraph 16(e) in the Participation Agreement did not change the amount Mr. Ericson owed Renasant or the collateral for the loan.

47.     After obtaining the Silverton participation piece from Gulf Coast in January 2010, Renasant did not pass along the $475,000 discount obtained to Ericson.

**D.     Loan Default and Sale of Home**

48.     Following maturity of the loan on November 21, 2009, the loan was in default. As of January 5, 2010, the day after Renasant acquired the participation interest from Gulf Coast Bank, Ericson owned Renasant $4,000,000 in principal on the loan.

49.     On January 15, 2010, Renasant foreclosed on the Wendells' CD. An audit request Renasant sent to Ericson on September 3, 2010 (several months after the filing of the present lawsuit) shows that the unpaid balance on the note was $3,000,000.

50.     Mr. Andrew William Moore, an appraiser from Florida, testified as an expert for the Ericsons. Moore had performed multiple appraisals of the Watersound house for Renasant.

51.     Moore testified the "as is" fair market value of the Florida house on specific dates was as follows:

--$3,825,000, as of December 5, 2008;

--$3,100,000, as of May 1, 2009

--$2,925,000, as of November 21, 2009

--$2,700,000, as of March 5, 2011.

Moore testified that the decline in the house's market value from December 2008 onward "was the result of declining real estate values in the subject area due to the general economic

downturn. The decline in market value was not the result of any defects or changes to the home."

52. During the pendency of this case, on June 30, 2011, the Ericsons were able to sell the house for $2.2 million. After the payment of customary fees and expenses, including real estate broker commissions, the sale transaction yielded net proceeds of $2,039,038.67. These net proceeds were paid to Renasant.

53. Renasant has made a claim for $51,372.48 in expenses for the house, primarily being payments for insurance, taxes, utilities, and similar matters. The Ericsons do not dispute the amount of this claim.

54. On September 21, 2009, before the loan had matured, Denise Moody, the wife of an officer in Renasant's special assets department, sent an email to Keith Flippo, a Florida realtor, that stated in part:

> I am forwarding you the email from my husband, Steve regarding Renasant Bank's possible foreclosure property in WaterSound [sic].
>
> Jason McClimans at Renasant Bank is handling this particular property.
>
> The bank is currently trying to decide what to bid for this property, at the foreclosure auction, so some expert advice on the current market value of the property is what is needed at the moment.

55. Ericson contended that sending this email, *inter alia*, breached the fiduciary duty that Renasant owed him.

56. Mrs. Ericson testified that, in January 2010, three offers to purchase the house were submitted through Marianne Grant, an agent in Flippo's company. The first offer was for $2,000,000, the second for $2,700,000, and the third for $1,250,000.

57.     Flippo testified at the trial and was questioned by counsel for Renasant, counsel for the Ericsons, and the Court.  Flippo denied telling anyone about the Moody email or its contents.  Flippo also denied discussing the contents of the email with anyone except Moody.  After considering Flippo's testimony, the Court finds that he is a credible witness and that he did not disclose the contents of the email to anyone other than representatives of Renasant.

58.     Mrs. Ericson had no involvement with the construction of the Florida house and was not involved in dealings with Renasant related to the construction loan.  Her only involvement came in her dealings with the realtors when the Ericsons began listing the house.

59.     Mrs. Ericson was the owner of the house.  She signed the mortgage but did not sign the loan agreement or the note.  Mrs. Ericson did not provide any evidence as to any loss she may have suffered as the property owner as a result of Renasant's actions.

## II. CONCLUSIONS OF LAW

### A.     Choice of Law

60.     As an initial matter, the Court must address whether Tennessee law or Florida law applies to the claims in this case.  Because this Court's jurisdiction is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332, the Court shall apply the choice-of-law principles of Tennessee, the forum state.  *See Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003); *AutoZone, Inc. v. Glidden Co.*, 737 F. Supp. 2d 936, 941 (W.D. Tenn. 2010).

61.     This case involves parties that reside and/or have business offices in Tennessee, conduct business in Tennessee, and dealt with each other exclusively in Tennessee.  The construction loan, however, was made for the purposes of building a house in Florida.  Some of the parties' claims and defenses are based on the loan contracts at issue, but others deal with independent tort allegations.

62.     With respect to most issues in this case, the laws of Tennessee and Florida do not materially differ.

63.     The September 21, 2006 promissory note, construction loan agreement, and mortgage all contain a choice-of-law clause providing that Florida law shall govern the parties' contractual relationship.  Subsequent extensions of the note do not contain any choice-of-law provisions but incorporate by reference the unmodified terms of the original documents. Tennessee gives effect to such contractual choice-of-law provisions.  *See Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 474-75 (Tenn. Ct. App. 2003) (quoting *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 650 (Tenn. Ct. App. 1999)).

64.     Certain of the Ericsons' affirmative defenses and claims against Renasant involve alleged torts that are not dependent upon or related to the contractual relationship.  With respect to tort claims, Tennessee has adopted the most significant relationship test to determine which state's law should apply.  *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992).  Under this test, "the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation."  *Id.*  In this case, any injury to the Ericsons occurred in Tennessee, where they live and work.  Moreover, Tennessee has the most significant relationship with respect to tort claims involving a Tennessee bank's dealings with Tennessee residents.  As such, the Court finds that Tennessee law governs the parties' tort claims and defenses that are not dependent upon the relationship defined in the contract documents.

**B.     Release of Claims**

65.     Before analyzing the substantive merit of each party's core claims, the Court must decide whether Ericson has released and/or waived any of his claims or defenses.

66. Renasant claims Ericson waived all claims, defenses, setoffs, and counterclaims he had against Renasant as of September 21, 2008, by executing a loan modification agreement containing an express waiver. Ericson disputes that he released any claims in the September 21, 2008 loan modification on the grounds that the inclusion of the release was the result of a mutual mistake of the parties and contends that the document should be reformed to exclude the release.

67. The construction loan documents provide that they are governed by Florida law. Under Florida law, "[a] person may waive any legally entitled rights guaranteed by the [state] Constitution, conferred by statute, or secured by contract. If the waiver is clear and unambiguous, it shall be given [its] intended force and effect." *Royal Palm Sav. Ass'n v. Pine Trace Corp.*, 716 F. Supp. 1416, 1419 (M.D. Fla. 1989).

68. A waiver of defenses, setoffs, and counterclaims in a loan modification agreement is enforceable with respect to all defenses and claims which arose prior to the execution of the modification. *Scarborough Assocs. v. Fin. Fed. Sav. & Loan Ass'n of Dade Cnty.*, 647 So. 2d 1001, 1003 (Fla. Dist. Ct. App. 1994). The maker of a note waives the defense of fraud or false misrepresentation upon giving a renewal note if he knows of the fraud or could have discovered it through the exercise of ordinary diligence. *Storrs v. Storrs*, 178 So. 841, 845 (Fla. 1937); *Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 522 (Fla. Dist. Ct. App. 1994).

69. A contract is valid and enforceable where it results from an arm's length negotiation between sophisticated parties, does not contemplate an illegal act, is not the product of duress, and would not be unconscionable to enforce. *Blasland, Bouck & Lee, Inc. v. City of N. Miami*, 96 F. Supp. 2d 1375, 1382 (S.D. Fla. 2000). Parties are charged with knowledge of the contract's contents and bound by its terms. *Allied Van Lines, Inc. v. Bratton*, 351 So. 2d 344, 347-48 (Fla. 1977); *State Farm Mut. Auto. Ins. Co. v. St. Godard*, 936 So. 2d 5, 10 (Fla. Dist. Ct.

App. 2006). These rules apply to the construction of release and waiver provisions. *See Churchville v. GACS Inc.*, 973 So. 2d 1212, 1216 (Fla. Dist. Ct. App. 2008).

70.     Mutual mistake is a valid defense to the enforcement of a release. *See CJM Fin., Inc. v. Castillo Grand, LLC*, 50 So. 3d 863, 864 (Fla. Dist. Ct. App. 2010). Florida law defines "mutual mistake" as the parties "'agree[ing] to one thing and then, due to either a scrivener's error or inadvertence, express[ing] something different in the written instrument.'" *L & H Constr. Co. v. Circle Redmont, Inc.*, 55 So. 3d 630, 634 (Fla. Dist. Ct. App. 2011) (quoting *Providence Square Ass'n v. Biancardi*, 507 So. 2d 1366, 1372 (Fla. 1987)). "If it is alleged that the language did not reflect the actual intent of the parties [or] that a party executed the document by mistake, . . . then the trial court may consider other facts related to the execution of the document in determining its scope and meaning." *McKeever v. Rushing*, 41 So. 3d 920, 923 (Fla. Dist. Ct. App. 2010). Specifically, where one party to the agreement seeks reformation of the waiver provision (as the Ericsons seek in this case), "parole evidence is admissible under those circumstances to determine the true intent of the parties." *Abernethy v. Nat'l Union Fire Ins. Co.*, 717 So. 2d 196, 198 (Fla. Dist. Ct. App. 1998). Because of the "strong presumption" of the accuracy of the written agreement, the party seeking to reform the agreement due to a mutual mistake must prove its case by clear and convincing evidence. *L & H Constr. Co.*, 55 So. 3d at 635.

71.     In the negotiation of the loan agreement and the extensions, Renasant and Ericson were sophisticated parties dealing at arm's length.

72.     The parties offered conflicting testimony as to their intent regarding the waiver. Ericson testified that he did not intend to waive his claims against Renasant by signing the renewal, nor did he read the entire renewal form before signing it. Given his educational and

professional background, Ericson should have read and reviewed the entire agreement, including the waiver clause. Any mistake regarding the waiver on Ericson's part arose from his lack of reasonable care and diligence.

73.     Waycaster testified that sixty-day administrative loan renewals are prepared by Renasant's central document preparation group in Tupelo, Mississippi. The loan officer (McClimans in this case) sends a renewal request to the document preparation group, which prepares the document and returns it to the loan officer for signature. The loan officer has no discretion to vary the terms of the document prepared by the document preparation group without receiving approval from senior management. The waiver language is part of the standard form used in every administrative loan renewal.

74.     McClimans testified that he did not draft the renewal document and had no control over its legal contents. He testified that his focus was on renewing the loan to fund Ericson's draw, and he did not personally intend for Ericson to waive his claims.

75.     The Court concludes that Ericson has not met his burden of proving by clear and convincing evidence that the parties made a mutual mistake by including the waiver language in the sixty-day renewal document. Ericson is not entitled to reformation of the administrative renewal document.

76.     The written waiver is unambiguous on its face. The Court must give effect to the waiver as written.

77.     By signing the sixty-day administrative renewal containing the waiver, Ericson waived all claims, defenses, setoffs, and counterclaims against Renasant as of September 21, 2008. Specifically, Ericson released all the following claims, which accrued on or before September 21, 2008:

--The claim that Renasant misrepresented Broadlands as "the preferred construction management and inspection provider" of Silverton, which Ericson alleged he learned was untrue in March 2007;

--The claim that "Renasant's agents promised that the timeliness of inspections and disbursements by Broadlands were not a problem when, in fact, these agents knew, or certainly should have known, that they had no basis for such an assurance." It is not disputed that Ericson was aware of the issues with Broadlands immediately after construction of the house began in November 2006;

--The claim that Silverton made misrepresentations or omissions regarding Silverton's working relationship with Broadlands and the handling of the Ericsons' transaction;

--The claim that Renasant was negligent in requiring Broadlands to administer all aspects of the construction loan process; and

--The claims that Renasant or its agent breached a contract with Ericson by not paying the contractors timely, not providing periodic progress reports, and not performing the inspections competently.

78.     Renasant also claims Ericson waived all claims and defenses as of March 20, 2009, the date Ericson last accepted a draw pursuant to the construction loan, under a common-law waiver theory. The Court need not reach this common-law waiver argument because all of the claims that Renasant seeks to include within it had accrued by September 21, 2008, the date that Ericson executed the administrative renewal with the waiver provision.

79.     Under Florida law, the release does not bar (a) any of Ericson's defenses and counterclaims that occurred after September 21, 2008, or (b) any defenses or counterclaims that were concealed or not otherwise known to Ericson as of that date.

80.     Under a piecemeal analysis of each side's respective claims and defenses, the Court must first make conclusions regarding Renasant's claims against Ericson, and then make conclusions regarding Ericson's claims against Renasant.  Certain issues raised by Ericson could constitute affirmative defenses or independent counterclaims.  The Court will address such issues in the sequence that provides the greatest clarity of analysis.  The effect would be the same, regardless of whether such claims are treated as offensive counterclaims or affirmative defenses.

## C.     Renasant's Claim: Breach of Promissory Note

81.     Renasant commenced this action against Ericson for breach of a promissory note in the original principal amount of $4,000,000.  The note provides that it is governed by Florida law.

82.     Under Florida law, "[t]he elements of an action for breach of contract are: (1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. Dist. Ct. App. 2006) (citing *Knowles v. C.I.T. Corp.*, 346 So. 2d 1042, 1043 (Fla. Dist. Ct. App. 1977)).  To maintain the action, the claimant "must also prove performance of its obligations under the contract or a legal excuse for its nonperformance." *Id.* (citations omitted).

83.     The promissory note is a contract between Ericson and Renasant.  Ericson breached the contract by failing the repay the $4,000,000 principal balance under the note on its maturity date of November 21, 2009.

84.     Renasant has proven performance of its obligations under the promissory note.  There is no dispute that Renasant advanced $4,000,000 to Ericson under the promissory note.

85.     The parties dispute the effect of Renasant's foreclosure on the $1,000,000 certificate of deposit pledged by the Wendells to secure the loan.  Under the rule of *lex loci*

*contractus*, a contract is presumed to be made with reference to the law of the place where it was entered into, unless there is evidence the parties entered the agreement in good faith with reference to the law of another state. *Deaton v. Vise*, 210 S.W.2d 665, 668 (Tenn. 1948); *accord Gregory v. Chem. Waste Mgmt., Inc.*, 38 F. Supp. 2d 598, 620 (W.D. Tenn. 1996). In the absence of proof to the contrary, the Court presumes the certificate of deposit is governed by Tennessee law.

86.     The Wendells' separate lawsuit against Renasant in another court concerning the certificate of deposit does not entitle Renasant to attempt to recover the $1,000,000 from Ericson in this case. Nor does Renasant have the right or obligation to sue Ericson on behalf of the Wendells. The doctrine of equitable subrogation allows the surety (the Wendells) to step into the shoes of the creditor (Renasant) and sue Ericson for reimbursement. *See Acuity v. McGhee Eng'g, Inc.*, 297 S.W.3d 718, 725 (Tenn. Ct. App. 2008) (citing *Restatement (Third) of Suretyship & Guar.* §§ 1, 27 (1995)). It does not allow the creditor to step into the shoes of the surety and obtain a double recovery of the debt.

87.     The Court concludes that Renasant lacks legal foundation for attempting to collect the $1,000,000 a second time from Ericson. As of January 15, 2010, the date Renasant foreclosed on the Wendells' certificate of deposit, the principal balance owing on the note was reduced from $4,000,000 to $3,000,000. This amount remained the principal balance of the loan until the sale of the house on July 1, 2011.

88.     The parties do not dispute that Ericson tendered proceeds of $2,039,038.67 from the sale of the house toward the principal balance due on the loan. Therefore, as of July 1, 2011, the principal balance was reduced from $3,000,000 to $960,961.33.

89.     The parties do not dispute the amount of expenses relating to the loan.  Renasant is entitled to an award of $51,372.48.

90.     Renasant's calculation of interest in its proposed conclusions of law is incorrect because that calculation assumes the principal balance remained $4,000,000 until the sale of the house on July 1, 2011.  Ericson erroneously argues that, because Renasant's calculation assumes an incorrect principal balance, Renasant should not recover any interest at all.  The Court will ask the parties to brief the issue of the appropriate amount of interest, based on the findings and conclusions made herein, and will add the appropriate amount of interest to the final judgment entered in this matter.

91.     Under the promissory note, Ericson is liable to Renasant for all costs of collection, including reasonable attorneys' fees.  At trial, the parties agreed that the issue of costs of collection should be reserved for a separate post-trial hearing.  The amount of costs of collection to which the Court determines Renasant is entitled will be added to the final judgment entered in this matter.

92.     Renasant has proven damages resulting from Ericson's breach of the promissory note contract in the amount of $1,012,333.81, consisting of $960.961.33 in outstanding principal and $51,372.48 of expenses, plus interest and costs of collection.

**D.      Ericson's Counterclaims**

**1.      Breach of Oral Contract**

93.     Ericson alleges that Renasant breached a contract with him by not giving immediate credit for the discount Renasant received on the repurchase of the Silverton participation.  The parties do not dispute that (i) after the FDIC seized the Silverton piece of the loan, Renasant promised to pass any discount obtained in repurchasing the loan to Ericson; (ii)

Renasant ultimately repurchased Silverton's $2,000,000 piece of the loan from Gulf Coast Bank for $1,525,0000, or at a $475,000 discount; and (iii) Renasant refused to give Ericson the discount. The parties dispute whether Ericson's repayment of the remaining outstanding principal balance of the loan is a condition precedent to Renasant giving Ericson the discount.

94.     Tennessee law applies to Renasant's oral offer regarding the discount on the repurchase of the Silverton participation. This offer does not arise out of the loan documents, so it is not governed by the choice of Florida law. As set forth above, in the absence of a choice-of-law provision, a federal court sitting in Tennessee will apply the rule of *lex loci contractus* to determine which state's laws govern the contract. There is no dispute that Rick Hart, Renasant's president for Tennessee, made the discount offer at Renasant's offices in Tennessee.

95.     Under Tennessee law, a party seeking to enforce an oral contract "must demonstrate (1) that the parties mutually assented to the terms of the contract and (2) that these terms are sufficiently definite to be enforceable." *Burton v. Warren Farmers Coop.*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002). Contract law disfavors condition precedents. *Koch v. Constr. Tech., Inc.*, 924 S.W.2d 68, 71 (Tenn. 1996).

96.     Based on the evidence presented at trial, the Court concludes that Renasant and Ericson mutually assented to Renasant's promising to pay the discount, with no condition precedent concerning the repayment of the outstanding principal balance. Ericson and McClimans testified that Hart promised the discount with no condition precedent. Hart testified that he conditioned the discount on the full repayment of the remaining principal balance of the loan. Having observed the testimony at trial, the Court finds that Hart was not a credible witness and assigns no weight to this testimony.

97.     Renasant breached the oral contract by refusing to give Ericson the $475,000 discount that Renasant had obtained in repurchasing the Silverton piece of the loan from Gulf Coast.

98.     Ericson is entitled to an award of $475,000 as compensatory damages for Renasant's breach.

### 2.      Promissory Fraud and Tennessee Consumer Protection Act

99.     Ericson maintains that, beyond a mere breach of contract, Renasant's actions relative to the discount amount to promissory fraud and a violation of the Tennessee Consumer Protection Act ("TCPA").

100.    The elements of a cause of action for promissory fraud are (1) intentional misrepresentation of a material fact, (2) knowledge of the representation's falsity or reckless disregard for its truth, (3) the plaintiff suffered injury from reasonably relying on the statement, and (4) the misrepresentation concerns a promise of future action without the present intention to perform. *Carter v. Patrick*, 163 S.W.3d 69, 77 (Tenn. Ct. App. 2004); *Stacks v. Saunders*, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990). "[F]or the plaintiff to demonstrate the lack of a present intent . . . , the plaintiff must do so 'by evidence other than subsequent failure to keep the promise or subjective surmise or impression of the promisee.'" *Stacks*, 812 S.W.2d at 593 (quoting *Farmers & Merchs. Bank v. Petty*, 664 S.W.2d 77, 81 (Tenn. Ct. App. 1983)); *accord Am. Cable Corp. v. ACI Mgmt., Inc.*, 2000 WL 1291265, at *5 (Tenn. Ct. App. Sept. 14, 2000) ("Failure to perform a promise, standing alone, is not competent evidence that the promisor never intended to perform.").

101.    As purported evidence that Renasant did not intend to credit Ericson with the discount at the time it promised to do so, Ericson cites (1) Renasant's failure to involve Ericson

in, or keep him updated on, the repurchase process; (2) the failure of any internal Renasant communication during the bid process to express an intent to credit Ericson with the discount; and (3) a December 2009 email from Fred Wyatt, chief credit officer at Renasant, seeking authorization to purchase the Silverton piece from Gulf Coast Bank for $1,525,000 and stating that the price "helps us with the $475,000 discount but, technically, I believe the loan amount would remain $4,000,000."

102.    The Court concludes that none of this evidence establishes that Renasant lacked an intention to perform the promise (made by Hart) to credit Ericson with the discount once it repurchased the Silverton piece of the loan. Instead, this evidence merely reflects Ericson's subjective impression that Renasant never intended to give him the discount. The ultimate refusal to give the discount, by itself, fails to establish that Renasant never intended to give the discount. Therefore, Ericson cannot prevail on his claim for promissory fraud.

103.    To recover under the TCPA, a plaintiff must prove that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA, which caused the plaintiff to suffer an ascertainable loss of money or property, and that the defendant's wrongful conduct was the proximate cause of the plaintiff's loss. Tenn. Code Ann. § 47-18-109 (2001 & Supp. 2011). *See Tenn. Med. Ass'n v. BlueCross BlueShield of Tenn., Inc.*, 229 S.W.3d 304, 311 (Tenn. Ct. App. 2007); *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005). The TCPA "does not impose a single standard applicable to all cases for determining whether a particular act or practice is deceptive . . . . To be considered deceptive, an act is not necessarily required to be knowing or intentional. Negligent misrepresentations may be found to be violations of the Act." *Faye v. Vincent*, 301 S.W.3d 162, 177 (Tenn. 2009). "A deceptive act or

practice is one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact." *Tucker*, 180 S.W.3d at 116.

104.    To establish that Renansant's promise (made by Hart) was a deceptive act, Ericson points to the same evidence used to support his promissory fraud claim.  Just as that evidence failed to establish the intent not to perform requisite for a promissory fraud claim, it also fails to establish that the promise of the discount was a deceptive act.  Ericson has not shown that, at the time Renasant made the promise, it was a false or misleading statement.

### 3.    Breach of Fiduciary Duty and Negligence

105.    Ericson seeks a judgment against Renasant for breach of its fiduciary duties.  Ericson alleges the following breaches: (1) Renasant and its agent Broadlands causing substantial delays in the construction of the house that resulted in a loss of market value, (2) failing to obtain the Silverton piece of the loan at a reasonable discount, and (3) emailing Flippo regarding the property.

106.    As an initial matter, the Court finds that this claim is governed by Florida law, as it stems predominantly from the relationship created by the loan documents at issue.  Under Florida law, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) the breach of that duty, and (3) damage proximately caused by that breach. *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002); *Moscowitz v. Oldham*, 48 So. 3d 136, 138 (Fla. Dist. Ct. App. 2010).

107.    Florida law "has generally refused to transform a banking relationship from a debtor/creditor relationship to one involving fiduciary duties."  *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543, 549 (Fla. Dist. Ct. App. 2003) (citing *Barnett Bank of W. Fla. v. Hooper*, 498 So. 2d 923 (Fla. 1986)).  In some instances, however, "a fiduciary relationship

arises where 'the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying on the bank so to counsel and inform him.'" *Capital Bank*, 644 So. 2d at 519 (quoting *Klein v. First Edina Nat'l Bank*, 196 N.W.2d 619, 623 (Minn. 1972)). Furthermore, "'special circumstances' may impose a fiduciary duty on a bank, including where the lender 1) takes on extra services for a customer, 2) receives any greater economic benefit than from a typical transaction, or 3) exercises extensive control." *Id.* (citing *Tokarz v. Frontier Fed. Sav. & Loan Ass'n*, 656 P.2d 1089, 1094 (Wash. Ct. App. 1982)).

108.     Ericson waived all claims related to Broadlands' actions by his execution of the 60-day administrative renewal in September 2008.

109.     Assuming without deciding that Renasant owed a fiduciary duty to Ericson, Rensant did not breach that duty by failing to bid an amount for the Silverton participation interest sufficient to win FDIC approval in the first round of exclusive bidding or in the DebtX auction. Ericson's argument relies on the flawless clarity of hindsight, which was unavailable to Renasant when it made its bids. McClimans testified the FDIC gave no guidance to Renasant regarding how much to bid for the participation. Renasant's management deliberated robustly before determining its bid prices and considered such factors as the likelihood the loan would be repaid, Ericson's lack of ability to carry or repay the debt, the motivation of the FDIC to sell the asset, and then-current real estate market conditions in Florida. The fact that Renasant was unsuccessful in its bids does not make it liable to Ericson for breach of fiduciary duty.

110.     To the extent that Ericson contends that Renasant was negligent in its efforts to repurchase the Silverton piece of the loan, the Court rejects that claim. The elements of a negligence claim are: "'(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause

26

in fact; and (5) proximate, or legal, cause.'" *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)). Renasant's conduct in repurchasing the Silverton piece of the loan did not fall below any duty to act in good faith and with reasonable care.

111. Although Ericson's proposed conclusions of law do not reference the Flippo email, the Court addresses the substance of these allegations in the interest of completeness. Ericson claims Renasant breached a duty it owed to him by sending an email to Flippo, a realtor in Florida, suggesting the house might go into foreclosure and asking for numbers on comparable sales. The email was sent by a realtor who is the wife of a Renasant employee. Flippo testified at trial that he did not discuss the contents of the email with anyone or tell anyone else that Renasant was considering foreclosure on the house. The Court finds that Flippo was a credible witness and concludes that, even if Renasant owed a duty to Ericson, the email to Flippo did not breach that duty. Nor did Ericson suffer any cognizable damages from the email to Flippo.

### 4. Fraudulent and Negligent Misrepresentation (Silverton's Role)

112. Ericson contends that Renasant is liable for failing to disclose the terms of the Participation Agreement and for stating that Silverton was a participating bank when, in fact, it was the controlling bank with ultimate authority. Ericson maintains these statements constituted fraudulent or negligent misrepresentations. Tennessee law governs these tort-based claims.

113. "In order to prove a claim based on fraudulent or intentional misrepresentation, a plaintiff must show that:

> 1) the defendant made a representation of an existing or past fact; 2) the representation was false when made; 3) the representation was in regard to a material fact; 4) the false representation was made either knowingly or without belief in its truth or recklessly; 5) plaintiff reasonably relied on the misrepresented

material fact; and 6) plaintiff suffered damage as a result of the misrepresentation."

*Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008) (quoting *Metro Gov't of Nashville & Davidson Cnty. v. McKinney*, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992)).

114. "Similarly, to succeed on a claim for negligent misrepresentation, a plaintiff must establish 'that the defendant supplied information to the plaintiff; the information was false; the defendant did not exercise reasonable care in obtaining or communicating the information and the plaintiffs justifiably relied on the information.'" *Walker*, 249 S.W.3d at 311 (quoting *Williams v. Berube & Assocs.*, 26 S.W.3d 640, 645 (Tenn. Ct. App. 2000)). Tennessee has adopted section 552 of the Restatement (Second) of Torts as the standard of liability for negligent misrepresentation actions against professionals and business persons. *Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn. 1997). In the course of business, "'[o]ne who . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.'" *Morrison v. Allen*, 338 S.W.3d 417, 437 (Tenn. 2011) (quoting *Restatement (Second) of Torts* § 552(1) (1977)).

115. "Under tort law, the failure to disclose material facts may be deemed equivalent to fraud or misrepresentation 'only in the cases where the person being held responsible had a duty to disclose the facts at issue.'" *GuestHouse Int'l, LLC v. Shoney's N. Am. Corp.*, 330 S.W.3d 166, 195 (Tenn. Ct. App. 2010) (quoting *Macon Cnty. Livestock Mkt., Inc. v. Ky. State Bank*, 724 S.W.2d 343, 349 (Tenn. Ct. App. 1986)). The duty to disclose arises if the parties had a "previous definite fiduciary relation," one or both contracting parties "expressly reposes a trust

and confidence in the other," or the contract "is intrinsically fiduciary and calls for perfect good faith." *Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis, PLLC*, 491 F.3d 522, 528 (6th Cir. 2007).

116.    Silverton had control over decisions regarding the construction loan in limited circumstances. Pursuant to and subject to the terms of the Participation Agreement, Renasant, the originating bank, retained all rights with respect to enforcement, collection, and administration of the loan and the collateral.  Silverton could control the course of action the banks took with respect to the loan if, and only if: (1) Ericson defaulted under the loan documents or with respect to the collateral; (2) Renasant and Silverton could not reach a mutually agreeable course of action within ten business days; and (3) Silverton held at least 50% of the outstanding principal balance of the loan or Silverton held any participation interest because of Renasant's inability to fulfill its obligation to repurchase the participation interest due to regulatory lending limits.

117.    The conditions precedent for Silverton asserting control over the loan never occurred.  Ericson defaulted under the loan on November 22, 2009 when the loan matured, and he did not repay the outstanding principal balance.  At the time of default, the FDIC held the participation interest but had agreed to sell it to Gulf Coast, effective November 30, 2009.  From November 30, 2009 to January 4, 2010, Gulf Coast owned the participation interest.  On January 4, 2010, Renasant repurchased the participation interest from Gulf Coast.  No one from Silverton, the FDIC, or Gulf Coast ever contacted Ericson regarding the construction loan. Accordingly, as a matter of law, the controlling bank in the events of default and of a disagreement among the banks regarding the course of action was wholly immaterial.  Assuming without deciding that a duty to disclose existed, the claims for fraudulent misrepresentation and negligent misrepresentation fail because Ericson suffered no damage as a result of the non-

disclosure of the terms of the Participation Agreement and of the statements about Silverton's role as a participating bank.

118. In addition to the absence of pecuniary loss, Ericson's fraudulent misrepresentation claim also fails because the evidence shows that Renasant did not make a misrepresentation or non-disclosure knowingly, without belief in its truth, or recklessly. The testimony consistently established that the provision giving control to Silverton under certain circumstances in the event of default was highly unusual in the banking industry and unknown to Renasant until the FDIC seized Silverton and Renasant officials reviewed the Participation Agreement for the first time.

**5.      Fraudulent and Negligent Misrepresentation (Silverton's Failure)**

119. Ericson further alleges that Renasant knew, or should have known, about Silverton's poor financial condition before its seizure by the FDIC on May 1, 2009. Ericson claims Renasant committed actionable misrepresentations by not telling him about Silverton's condition prior to the FDIC takeover.

120. As evidence, Ericson points to a May 5, 2009 email, in which McClimans said that Silverton "got greedy and there wasn't a condo loan in Florida or Vegas they didn't like" and that "[i]t's no shock that they are in the situation they're in because they had unlimited expense accounts with no controls." McClimans's email cited an example from several years prior in which Silverton paid for a lavish business trip for eight Renasant employees.

121. Ericson also points to Hart's testimony that, in late 2008, a friend called Hart to state that Silverton was having problems, a predicament that Hart independently confirmed by calling his friends on the Silverton board. Hart's friends told him that they did not think the issues would be overwhelming. Although the Court has not found Hart to be a particularly

credible witness on other points, Ericson provided no other evidence to rebut Hart's testimony on this point.

122.    Whether Ericson proceeds on an intentional or negligent misrepresentation theory, the concealed fact must be material.  *See Walker*, 249 S.W.3d at 311 (fraud); *McNeil v. Nofal*, 185 S.W.3d 402, 408 (Tenn. Ct. App. 2005) (negligent misrepresentation).  Under Tennessee law, a fact is material if:

> (a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or
> (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matters as important in determining his choice of action, although a reasonable man would not so regard it.

*Restatement (Second) of Torts* § 538(2); *see Odom v. Oliver*, 310 S.W.3d 344, 349 (Tenn. Ct. App. 2009).  Applied to these facts, the Court finds that the facts Renasant failed to disclose about Silverton—namely, that it was "greedy," "had unlimited expense accounts with no controls," and was going through issues its board members did not consider to be overwhelming—were not material.  Neither a reasonable person nor Ericson himself would have regarded these general descriptions of Silverton's internal operations to be important in determining what action to take concerning the construction loan transaction.  Indeed, at that advanced stage of the construction loan, the Court finds it highly unlikely Ericson would not have changed course based on this information, as the construction of the house had already fallen behind.

123.    The Court concludes that no one at Renasant knew that the FDIC would seize Silverton until the seizure had already taken place.  Nor did Renasant act recklessly or negligently with regard to this information.  Assuming without deciding that Renasant owed Ericson a duty (whether grounded in fiduciary law or principles of negligence law) to investigate

Silverton's condition, Hart testified without rebuttal that he contacted members of the Silverton board after hearing that Silverton was having issues. This inquiry satisfied Renasant's obligations to Ericson.

124. The misrepresentation claims involving Silverton's financial condition also fail because they did not cause damage to Ericson. No one from Renasant, Silverton, or the FDIC contacted Ericson to cease construction when Silverton failed. Nor did anyone from Silverton, the FDIC, or Gulf Coast ever contact Ericson regarding the participation interest. No action was taken to collect the loan until Renasant had repurchased the participation interest from Gulf Coast.

**6. All Other Claims**

125. All of Ericson's counterclaims not specifically addressed herein are dismissed with prejudice, the evidence at trial failing to establish that Ericson is entitled to relief.

**E. Mrs. Ericson's Claims**

126. Mrs. Ericson joined in the Counterclaim as an additional claimant. She claims that Renasant made misrepresentations to her and engaged in unfair and deceptive acts or practices which harmed her. She also alleges damages in connection with each of Ericson's causes of action. For the following reasons, the Court concludes that Mrs. Ericson has not proven a cause of action against Renasant.

127. Mrs. Ericson owned the lot on which the house was constructed and thus signed the mortgage in connection with the loan closing. She did not sign the promissory note or the construction loan agreement. She did not seek financing or otherwise deal with Renasant in negotiating the construction loan. After signing the mortgage, she had no involvement with the construction process. When the house was placed on the market, she signed the listing

agreements and participated in the marketing of the house because the lot and house were titled in her name.

128. Mrs. Ericson entered no contract with Renasant except the mortgage and has offered no proof that Renasant breached its terms. Mrs. Ericson presented no proof from which the Court could conclude that Renasant owed a fiduciary duty or other duty of care toward her. Nothing about the mortgage loan (as opposed to the construction loan) suggests the kind of special relationship that would transform the debtor/creditor relationship into one involving fiduciary duties. There is no evidence that Renasant made any false representations to her.

129. Moreover, Mrs. Ericson has incurred no loss that was caused by Renasant and presented no proof of damages. She is not liable for the deficiency on the promissory note. Accordingly, the claims Mrs. Ericson asserts against Renasant are dismissed.

### III. CONCLUSION

For the reasons stated herein, the Court determines that Plaintiff Renasant Bank is entitled to compensatory damages resulting from Defendant Eric Ericson's breach of the promissory note contract in the amount of $1,012,333.81, consisting of $960,961.33 in outstanding principal and $51,372.48 of expenses. Renasant is also entitled to interest and costs of collection, including attorneys' fees.

The Court also determines that Counter-Plaintiff Eric Ericson is entitled to compensatory damages for Counter-Defendant Renasant Bank's breach of the oral contract to credit the Silverton repurchase discount against the outstanding construction loan principal balance in the amount of $475,000. All of the other counterclaims are dismissed with prejudice.

Renasant Bank shall file a brief in support of its claim for interest and the costs of collection by March 23, 2012. This brief shall set forth the amounts to which Renasant Bank is

entitled, pursuant to the loan agreements at issue in this case. The Ericsons shall file their response by April 6, 2012. The Court sets this matter for a hearing on April 20, 2012.

An appropriate Order will enter.

It is so ORDERED.

                                        _____
                                        KEVIN H. SHARP
                                        UNITED STATES DISTRICT JUDGE